# Wytheville.

## HARPER GREEN LANGFORD v. COMMONWEALTH.

June 12, 1930.

Absent, Prentis, C. J., and Epes, J.

The opinion states the case.

*O. G. Kendig* and *N. S. Turnbull, Jr.*, for the plaintiff in error.

*John R. Saunders, Attorney-General, Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General*, and *Joel W. Flood*, for the Commonwealth.

HOLT, J., delivered the opinion of the court.

Harper Green Langford, at the July term of the Circuit Court of Charlotte county, was convicted of

violating the prohibition law. A jury fixed his punishment at four years confinement in the penitentiary. That verdict was confirmed by the trial court and its judgment is now before us on a writ of error.

The indictment contains two counts. In the first he is charged with the unlawful manufacture of ardent spirits and in the second with the possession without permit of a still. Each of these counts contains a charge of previous conviction.

The defendant moved to quash on the ground that his first conviction was on a blanket indictment; that the record of this conviction does not show the particular offense upon which it rests; that the law only imposes additional and different penalties for certain violations of the prohibition law when committed a second time, and that for these reasons it is not possible to say, looking to the record alone, that the rules governing second conviction apply at all to the instant case. *Keeney* v. *Commonwealth*, 147 Va. 678, 137 S. E. 478.

By statute in Virginia any person who unlawfully manufactures distilled ardent spirits is guilty of a felony [Code, section 4675(5)]; and in the same section it is declared that any person who shall violate other provisions of designated sections shall be deemed guilty of a misdemeanor for the first offense and of a felony for any subsequent offense committed after the first conviction; and as an exception to the general rule thus stated it was futher provided that the offense of drinking, giving away or receiving ardent spirits should not be deemed a felony in any case, subject to certain further exceptions, and that the purchasing or having in possession of ardent spirits for personal use should in no case be deemed a felony, all of which makes plain the necessity for setting out in detail the offense for which the first conviction was had.

■ A prior conviction does not change or increase the penalty for manufacturing, which is a felony in itself, and since this is true there was no occasion for putting a charge of second conviction in the first count, and it should not have been done, but no harm followed because it properly appeared in the second count and in that way and in orderly procedure came to the jury's attention.

■ ■ When we come to the second count the situation changes. The possession of a still is a misdemeanor, Code sections 4675(6), 4675(20), punishable by a fine of not less than $50.00 nor more than $500.00 and by confinement in jail not less than one nor more than six months, and in this subsection 6 it is provided that the penalty for any subsequent offense committed after the first conviction which is not declared to be a felony, shall be by a fine not exceeding $500.00 and by imprisonment in jail for not less than three nor more than twelve months. It was, therefore, proper in the second count to set out the first conviction which raised the offense from a simple to an aggravated misdemeanor carrying heavier penalties. The additional penalties apply to all second offenses not made felonies by the statute and apply in the instant case. When we are dealing with first convictions relied upon to support a charge of felony we find that there are certain exceptions; that not all first convictions will support such a charge and, therefore, that their character should be set out, but when we come to first convictions which aggravate the second offense and enlarge its punishment, as a misdemeanor only, we find that any previous conviction is sufficient unless it be one which makes the second offense a felony, and for that reason its details are not necessary. A very satisfactory discussion of the subject of second

conviction by Judge Chichester will be found in *Keeney* v. *Commonwealth*, 147 Va. 678, 137 S. E. 478.

■ The motion to quash was general and since the second count was good, it should have been rejected even though the first contained prejudicial error. *State* v. *Cartright*, 20 W. Va. 32; *Commonwealth* v. *Litton*, 6 Gratt. (47 Va.) 691; 31 Corpus Juris, page 812.

■ Since no objection can be successfully urged against the second count, it follows that the court committed no error in permitting the introduction of a record showing a first conviction, although that record does not show the crime in detail upon which it rests. If the first conviction did not make the second offense a felony, it increased its gravity even though it remained a misdemeanor, and so this evidence was competent.

■ Does the evidence sufficiently support the verdict? The trial court thought it did and confirmed it by judgment. By statute it is provided, Code section 6363, that: "The judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong, or without evidence to support it." *Davis* v. *Commonwealth*, 132 Va. 527, 110 S. E. 252; *Nelson* v. *Commonwealth*, 153 Va. 909, 150 S. E. 407. Of course the evidence relied upon must not strain the credulity of the court; in short, it must fairly sustain the verdict. *Flannagan* v. *Northwestern Mutual Life Insurance Co.*, 152 Va. 38, 146 S. E. 353; *Meade* v. *Saunders*, 151 Va. 636, 144 S. E. 711.

On the day preceding the arrest, S. A. Jackson, a deputy sheriff, with a companion, went to see R. A. Langford about a matter of business not connected with this prosecution. Upon reaching Mr. Langford's

home they were told that he was not there, but had gone with one A. J. Camp to the home of R. G. Langford, father of the defendant. Jackson then set out for the R. G. Langford home, but after traveling about six miles his car mired and he had to get out and walk. Not being familiar with that locality he followed a fresh car track which led him down a plantation road to its intersection with another plantation road and then into an obscure side road, down which he came upon the car he was following. It stood by a ford across a branch and by it stood a young girl who seemed much excited. He asked to be directed to the Langford home and was told that he should have turned to the right instead of to the left at the plantation road. Jackson then started back to his car. When he had gone about sixty yards over a hill and out of sight of the car in the branch, he heard its horn blow and turned back. When he again came in sight the small girl was still standing by it. Coming down the branch and about twenty-five steps away was an older girl, and coming up the branch and about forty yards down the stream was the accused, who when first seen was about sixty-eight yards from where the still was afterwards found downstream. About the time that Jackson first saw him he "ducked down out of sight" and came to his car from a direction different from that of his first approach. When Langford reached his automobile he began to pour water on the front wheel and told Jackson that he had come there to wash his car. Jackson left and Langford soon afterwards overtook and passed him. His car was then still unwashed.

The accused, testifying as to what occurred on this occasion, said that he took his car to wash it and when Jackson came was away because of some call of nature.

He further denied that when seen by Jackson he was coming up the branch from the direction of this distillery. Neither of the girls was called as witnesses.

He did not, as a matter of fact, wash his car and so the jury was warranted in believing that he did not take it to this branch for that purpose and that on a material point his testimony did not conform to the facts.

On the day following, Jackson, another deputy sheriff, and two prohibition officers went back to this ford. Downstream 128 yards, not on Langford's land but near it, they found a still being operated by A. J. Camp. Camp ran but was captured after a chase and about a mile away. The party then returned to the still site to await possible developments. After half an hour the defendant, leading a pair of mules, came down the road, tied them to a tree a little over 100 yards away, and started directly to the still itself. After going a short distance he whistled to signal his approach and one of the deputy sheriffs answered. With confidence so fortified, he continued to advance until he found himself under arrest.

Substantially the same account of what took place is given by the other officers. Mr. Robey, a deputy sheriff, said that while Camp was under arrest, and when the accused was coming towards the still, Camp raised his hands and tried to motion him back, and persisted in talking so loud when Langford was approaching that he threatened to shoot him unless he kept quiet.

Camp, himself, lived several miles from where this still was and had left his automobile at Langford's home on the day of the arrest. His evidence is that he took his car to Langford's to get a connecting rod for it and walked from there to the distillery.

The accused, when arrested, made no resistance, disclaimed all knowledge of the still, and said that he was then engaged in hauling ties in that neighborhood for his father. In further explanation of his conduct he stated that he saw smoke down in the woods and impelled by curiosity came to find out about it, and furthermore, suspecting the possibilities of a still, he whistled as he came to prevent being shot by some suspicious and nervous operator. We think it may be taken as true that the accused was, or had been, hauling ties for his father, but this explanation of his conduct is not entirely satisfactory and manifestly did not satisfy the jury. We find him on the day preceding his arrest coming from the direction of the still which was only sixty-eight yards away, and we have seen that he accounted for his presence there by statements which appeared not to conform to the facts. The next day he turned up at this same out-of-the-way place, led, as he said, by curiosity and because he saw some smoke. It is not reasonable to believe that the fire had been replenished from the time Camp ran until Langford was arrested, or for about an hour, by that time it probably gave off little or no smoke; nor is it likely that Camp would have come seven or eight miles from home to locate a still where ties were being cut and hauled unless there was some understanding with the lumbermen. He seems to have made the Langford home his headquarters; he was there upon the day preceding his arrest; his automobile was there on the day he was arrested and by his evidence he walked from there to the still. When the officers stood concealed around it, and when Langford was approaching, Camp in vain gave him the grand hailing sign of distress, and made so much noise that an officer had to threaten to shoot

him to keep him quiet. None of these incidents are sufficent to establish guilt, but taken together they are sufficient to sustain the jury's verdict. Of course circumstancial evidence should be looked upon with caution, but evidence is seldom sufficient to establish any fact as demonstrated and beyond all doubt. Witnesses sometimes perjure themselves and if too much were required by way of proof the administration of law as a practical proposition would be at an end. Facts which a jury find to be true and which, from the evidence, may be true, must be taken as established.

Those found present at a still in operation are presumed to be guilty of manufacturing, Code section 4675(20); *Zimmerman* v. *Commonwealth*, 148 Va. 745, 138 S. E. 569. Of course this presumption is rebuttable. When it is overborne it is usually a question for the jury. Langford, at the time of his arrest, was only twenty or twenty-five yards from the still and coming directly towards it.

We think that he was present within the purview of the statute, nor was it necessary that he should have actually been present on that particular day. Any day within the twelve months preceding his indictment was sufficient. *Widgeon* v. *Commonwealth*, 142 Va. 658, 128 S. E. 459.

The jury did not accept the evidence of the defendant, of his father, or of Camp, and they were not obliged to accept it, even when uncontradicted. *Clopton's Case*, 109 Va. 813, 63 S. E. 1022; *Boggs* v. *Commonwealth*, 153 Va. 828, 149 S. E. 445, and authorities there cited. Camp may have been disinterested, but his conduct does not support that conclusion. He had already been convicted and so was beyond praise or blame. He had tried to protect Langford once and the jury may have believed that he was still anxious to help.

The jury heard these witnesses testify. They were not called upon to accept their statements and did not accept them, and their judgment the trial judge has stamped with his approval.

The jury reached the conclusion that the accused was guilty, the trial judge thought they were right, there is evidence to support their judgment, and it must stand affirmed.

*Affirmed.*

HUDGINS, J., dissenting.